575 F.2d 1374
 17 Fair Empl.Prac.Cas. 1272, 17 Empl. Prac.
Dec. P 8427
 Harris A. PARSON, Plaintiff-Appellant,
v.
KAISER ALUMINUM & CHEMICAL CORP., and Local 13000, United
Steelworkers of America, AFL-CIO, CLC, Defendants-Appellees.
 
 No. 74-3468.
 United States Court of Appeals,
Fifth Circuit.
 July 10, 1978.
 Nils R. Douglas, New Orleans, La., Richard B. Sobol, Anne P. Buxton, Washington, D. C., for plaintiff-appellant.
 Carl J. Schumacher, Jr., Donald R. Mintz, New Orleans, La., Alfred D. Trehene, Washington, D. C., John C. Falkenberry, Birmingham, Ala., Burk & Burk, New Orleans, La., Michael H. Gottesman, Washington, D. C., for defendants-appellees.
 Robert J. Allen, Jr., Oakland, Cal., for Kaiser Aluminum, Etc.
 Jerry L. Gardner, Jr., New Orleans, La., for Local 225.
 D'Amico & Curet, Baton Rouge, La., for United Machine Workers of America, Int'l Union 50.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, Chief Judge, THORNBERRY, Circuit Judge and MILLER*, Associate Judge.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Plaintiff, a black employee at the Chalmette, Louisiana plant of Kaiser Aluminum and Chemical Corporation (Kaiser), appeals from a judgment dismissing his individual and class claims of racial discrimination in employment. Finding errors of both fact and law in the dismissal at the close of the plaintiff's case, we reverse and remand.
 
 I.
 
 2
 In July 1966, the named plaintiff, Harris Parson, filed a charge with the Equal Employment Opportunity Commission (EEOC) under section 706(e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e), claiming that Kaiser discriminated against him on the basis of his race in refusing to promote him to the position of foreman. Parson also alleged that Kaiser maintained racially segregated facilities and that, with the cooperation of the employees' bargaining representative, Local 225 of the Aluminum Workers International Union (Local 225),[1] denied black employees equal opportunities for advancement. The EEOC found reasonable cause to believe that Kaiser and Local 225 engaged in discriminatory practices and, after attempting a cure by conciliation, issued Parson a right to sue notice in August 1967.
 
 
 3
 Parson brought suit in September 1967, seeking relief against Kaiser under the Civil Rights Act of 1866, 42 U.S.C. § 1981,[2] and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.,[3] and against the Union for violations of Title VII and of the duty of fair representation imposed by 29 U.S.C. §§ 151 et seq. Another black employee, Arcell Williams, joined Parson in the suit, claiming that he had been discriminatorily discharged. Parson and Williams subsequently amended their complaint to include allegations of discriminatory employment practices against a class of black hourly employees.[4] After extensive and prolonged pretrial proceedings, the case came to trial in 1973. At the conclusion of the plaintiffs' case, the defendants moved under F.R.Civ.P. 41(b) for an involuntary dismissal on the ground that "plaintiffs have shown no right to relief" on either their individual or class claims. The District Court recessed the trial, dismissed Williams' claim and, in May 1974, some fourteen months later, dismissed Parson's individual suit and the class action.[5] In its findings of fact and conclusions of law issued under F.R.Civ.P. 52(b), the District Court held that no discrimination was present in any of the actions or practices asserted by the plaintiffs. Parson appeals on behalf of himself and the class he represents from the judgment in favor of the defendants.
 
 
 4
 Although the complaint alleged a variety of discriminatory practices,[6] the appeal is limited to the following findings and conclusions: defendant Kaiser did not discriminate against Parson by refusing to award him the promotion he sought; Kaiser did not discriminate against the class in making promotions to supervisory positions; Kaiser did not discriminate in providing training and opportunities for entry to craft positions; and Kaiser and the Union did not discriminate in the contractual procedures governing bidding and transfers.
 
 
 5
 We hold that as to each of these issues, the District Court erred in holding that no discrimination was evidenced and in dismissing the suit. We reverse and remand for further proceedings consistent with the standards developed in this Circuit and the Supreme Court for judging claims of racial discrimination in employment.
 
 II. The Challenged Employment Practices
 
 6
 Kaiser is engaged in the production of aluminum from powered alumina at the Chalmette facilities. At the time of trial, the plant employed over 2,400 people, of whom approximately 20 percent were black. Kaiser has operated the Chalmette plant since 1951. At that time, blacks were hired only as laborers and the physical facilities of the plant were rigidly segregated.[7] Plaintiff's essential claim at trial and on this appeal is that insufficient progress has been made since then to satisfy the requirements of the civil rights statutes.[8]A. Promotions to the Position of Foreman
 
 
 7
 The plaintiff presented evidence tracing the evolution of the procedures for selecting foremen from the hourly employees.[9] Until April 1966, Kaiser had no written procedures or standards governing such promotions. At that time, Kaiser adopted a system requiring each shift foreman to evaluate the hourly employees under his supervision every six months and report the names of likely candidates. Those listed would be further screened by the general foremen and departmental superintendents, and if approved, would be administered two personnel tests, the Wonderlic Test and the How to Supervise Test. The candidates achieving sufficiently high scores would then be classified as "trainee foremen," a status that allowed them to replace absent permanent foremen and, depending on their success, to advance to a permanent position as openings occurred. Parson's application for promotion was considered one month after this procedure had been adopted.
 
 
 8
 This system for considering applicants was modified in June of 1967 to ameliorate the requirement that an hourly employee could not become a candidate for a supervisory position without his immediate foreman's recommendation. The revised procedure required each foreman to submit the names of those employees who had indicated a wish to be promoted, "but whom the Foreman believes do not have the qualifications." An applicant not approved by either his shift foreman or the department superintendent was further reviewed by a committee authorized to reverse the previous decisions and allow the employee to take the personnel tests.
 
 
 9
 The following year, Kaiser's program was revised, apparently to reflect and anticipate changes in the law of employment discrimination. The use of the Wonderlic Test for identifying qualified condidates was eliminated after a validation study designed to relate the tests to the demands of the job failed.[10] In 1970, Kaiser further revised the selection methods by instituting a procedure for selecting permanent foremen. This procedure was based on annual evaluations and recommendations from immediate supervisors subject to review by general foremen and department superintendents. When vacancies occurred, the department superintendent and personnel relations superintendent would select candidates from the group judged qualified in the annual screening. These prospects were interviewed and a choice recommended for the final approval of the plant works manager.
 
 
 10
 The last revision in the selection procedure relevant to this litigation occurred in April 1972. For the first time, vacancies in shift foremen positions were posted on a central bulletin board. An hourly employee interested in the position requested an application form, and the applications, together with the written evaluation of the applicant's foreman, were screened by a committee that interviewed the leading candidates and made a final recommendation. The committee, which consisted of five persons, had a frequently changing membership, and in at least one instance documented in the record, the membership included blacks. In making its selections, the committee used a written list of criteria and standards. This list represents the first written standards guiding the selection of supervisors used at the Chalmette plant.
 
 
 11
 The plaintiff's brief paints the following statistical picture of Kaiser's foreman population.[11] In July 1965, when Title VII became effective, there were 209 supervisors employed at the Chalmette plant, all of whom were white. Of these, over 150 served as shift foremen, the position to which Parson aspired. In July of 1965, Kaiser employed 1,873 hourly production workers, of whom 15 percent were black. In September 1971, when Kaiser filed its last responses to discovery motions, 164 shift foremen served at the plant, of whom 8, or less than 5 percent, were black.[12] At that time, more than 21 percent of Kaiser's hourly employees, and 29 percent of the hourly production workers, were black. Between July 1965 and September 1971, 9 blacks were promoted to shift foreman jobs. Between September 1971 and the time of trial, April 1973, 4 additional blacks were promoted.[13] All but one of this last group was selected under the 1972 selection procedure.
 
 B. Interdepartmental Transfers
 
 12
 A Kaiser employee who desires to transfer to a position in another department must follow the procedures established by the contractual agreement between Kaiser and the Union. The Supplement Seniority Agreement (sic) of February 1, 1972, in effect at the time of trial, requires that vacancies for permanent jobs (except those openings subject to "departmental job bids," discussed below) are to be posted at centrally located bulletin boards and that employees are to use a formal bidding system to apply for the openings. Success in transfer is determined by either plant seniority alone or by a combination of plant seniority and other qualifications. To assess the impact of these procedures, it is necessary to examine the development of the transfer and seniority systems before and after the effective date of Title VII.
 
 
 13
 Kaiser restricted blacks to menial positions laborer and porter from 1951 to 1956, when blacks were allowed to transfer to some production departments.[14] Entry into production departments remained subject to other restrictions, however. A "passing" score on the Wonderlic Test was required as a condition of entry to some of the production departments until 1968. Until 1962, departmental seniority determined eligibility for transfer and advancement: employees within a department would bid on vacancies on the basis of their relative length of service within that department. In 1962, plant seniority was substituted for departmental seniority as the bidding standard within the production departments, and in 1962, plant seniority was adopted as the standard in the craft departments as well. Under this system, an employee's eligibility for bidding is based on his total length of service at the Chalmette plant.
 
 
 14
 The plaintiff's major complaint as to the present transfer system is that employees transferring to a new department can bid only for entry level jobs in that department, usually the job of "spare." Vacancies for positions above the entry level are posted only within that department and only employees already in the department are eligible to bid. A transferring employee must occupy the spare position in the new department for a minimum of ten days, during which time he may elect to return to his old job with no loss in pay, seniority, or eligibility for promotion in the old department. At the end of the ten-day trial period, the transferee is eligible to bid for vacancies that arise in the new department on the basis of his plant seniority. If the spare job pays less than the job from which the employee has transferred, he must take the cut in pay until a higher paying job in the new department becomes available and the employee is able successfully to bid for it. A departmental employee thus has preference over employees from other departments for promotion to all non-entry level vacancies within his department.[15]
 
 C. Entry Into Craft Positions
 
 15
 The craft positions at issue come within the jurisdiction of the Power Maintenance Department and the Reduction Maintenance Department at the Chalmette plant.[16] Most of the craft positions are filled without on-the-job training or apprenticeship programs. The following requirements are or have been conditions for entry to such positions.
 
 
 16
 Prior experience. Most of the craft jobs require previous experience in the craft involved. While the length and type of experience required varies from craft to craft, industrial experience is preferred. There is some evidence in the record that this requirement is not consistently applied and that decisions to waive or modify it are within the discretion of the supervisor involved in the hiring process.
 
 
 17
 Testing and educational requirements. Beginning in 1959 and continuing until 1968, Kaiser required that an applicant achieve a certain score on the Wonderlic Test as a condition for entry to any craft position.[17] This requirement was dropped after a 1967 validation study indicated that the test could not satisfy the standards governing the permissible use of such employment devices.[18] Until 1968, Kaiser also required each applicant to take a written test relating to the skills of the particular craft involved. After these tests were eliminated, Kaiser used "structured interviews" to examine applicants orally on the same information. Until 1970, a high school diploma was a prerequisite for entry into several of the crafts.
 
 
 18
 Training programs. Kaiser adopted its first training program for craft jobs in April 1969. Under this program, which applied to the categories of electrician, instrument repairman, and mechanic, trainee jobs were open for plant-wide bidding. However, trainees were required to have completed two years of high school to be eligible for the mechanic program, to have a high school diploma for the other two craft programs, and to pass an aptitude test administered by the Louisiana State Employment Service. Two of the twelve craft trainees enrolled in the program after a little over one year of operation were black.
 
 
 19
 Parson draws on Kaiser's Affirmative Action Report for statistical information as to the impact of Kaiser's entry requirements.[19] Of the craftsmen employed in 1965, 3, or less than 1 percent, were black. In 1971, 8 out of 468 craftsmen, or approximately 2 percent, were black. At the time of trial, there were a total of 11 black craftsmen employed at the plant, all working in the Reduction Maintenance Department. While Parson concedes that complete figures as to employee turnover in the crafts since 1965 are not available, he convincingly uses Kaiser's 1970 Seniority List to provide a rough estimate.[20] This list shows that Kaiser hired 22 of the 96 craftsmen in the Power Maintenance Department after 1965; 1 of the 22 was black. Of the 365 craftsmen in the Reduction Maintenance Department, 65 were hired after 1965, and of these, 3 were black.
 
 
 20
 Parson bases his challenges to the District Court's findings on the premise that in each of the areas detailed promotions to foreman, transfer, and entry to the crafts he presented a prima facie case of racial discrimination.
 
 III. The District Court's Judgment
 A. Parson's Individual Claim
 
 21
 Harris Parson was hired as a laborer at the Chalmette plant in 1953. In 1961, he transferred to the Metal Products Department as a "spare" and in 1964 was promoted to the semiskilled job of furnace operator, one of the top jobs in the department. In June of 1966, Parson requested that he be considered for the position of temporary foreman, the first black in his department to ask for such a promotion. After his request was denied, Parson filed a complaint with the EEOC and subsequently brought this suit. At trial, and on this appeal, Parson claimed that his work record was excellent, that his union activities demonstrated leadership capabilities, and that the only reasons for the failure to promote him were his race and his outspoken efforts to hasten the integration of the plant's facilities. To support his claim of racial discrimination, Parson introduced evidence of the comparative qualifications of white men who were promoted shortly after Parson's request was denied; asserted that the procedures for awarding promotions themselves violated Title VII; and urged that statistics comparing the number of black and white foremen to the racial composition of the hourly employee population showed a pattern of discrimination in promotions at the plant. At the close of plaintiff's evidence, the District Court Judge made the following finding of fact:
 
 
 22
 "The testimony at trial revealed that Parson was considered for promotion to foreman but did not get the job because he did not possess or demonstrate the requisite attributes necessary to perform the job. Parson did not get the job of foreman not because he was black but rather because he was not qualified. In fact, other black men have made foreman and other salaried positions in a number of departments of the Chalmette Works."
 
 
 23
 (Appendix, Vol. I, at 25.) On this basis, the District Court Judge concluded that Kaiser had not discriminated against Parson.
 
 
 24
 In reviewing the District Court's findings of fact, we are mindful of our limited authority under the clearly erroneous standard of F.R.Civ.P. 52(a). However, we are equally mindful that the clearly erroneous standard does not apply to findings made under an erroneous view of controlling legal principles. United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, 423-24, cert. denied, 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815; Rowe v. General Motors Corp., 5 Cir., 1972, 457 F.2d 348, 356 n. 15. We are also careful in discrimination suits, where the elements of fact and law become particularly intermeshed, of the distinction between findings of subsidiary fact and findings of ultimate fact. A finding of nondiscrimination is a finding of ultimate fact that can be reversed free of the clearly erroneous rule. "In reviewing the District Court's findings, therefore, we will proceed to make an independent determination of appellant's allegations of discrimination, though bound by findings of subsidiary fact which are themselves not clearly erroneous. . . . (W)e must (also) determine whether there are requisite subsidiary facts to undergird the ultimate facts." Causey v. Ford Motor Co., 5 Cir., 1975, 516 F.2d 416, 420-21 (citation omitted).
 
 
 25
 In a nonclass claim of employment discrimination under Title VII, the plaintiff carries the initial burden of proving a prima facie case of discrimination. The elements of a prima facie case were delineated in McDonnell Douglas Corporation v. Green, 1973, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, 677: (i) the complainant must belong to a protected minority; (ii) must apply and be qualified for a job for which the employer is seeking applications; (iii) be rejected for the job; and (iv) the employer must then continue to seek applicants with the complainant's qualifications. When a plaintiff meets these criteria, the burden shifts to the defendant to show, by a preponderance of the evidence, that it had legitimate, nondiscriminatory reasons for its decision. If the defendant can meet this burden, the plaintiff must then prove, by a preponderance of the evidence, that the articulated reason is a pretext for discrimination. McDonnell Douglas Corporation v. Green, supra, 411 U.S. at 802-804, 36 L.Ed.2d at 677-79; Turner v. Texas Instruments, Inc., 5 Cir., 1977, 555 F.2d 1251, 1255. The District Court's only finding of fact as to Parson's claim is that "he was not qualified" for the position of foreman. For the reasons outlined below, this finding cannot stand and cannot serve as the basis for a Rule 41(b) dismissal.
 
 
 26
 The District Court Judge offered no hints as to the basis for his finding that Parson was not qualified for promotion to the position of foreman. We are simply unable to determine whether the Judge found sufficient subsidiary facts to undergird the ultimate finding that the decision not to promote Parson was not racially motivated or taken in retaliation for his involvement in racial relations at the plant.[21] It is therefore necessary for us to reverse the dismissal of Parson's claim and remand for an articulation of the basis for the Judge's conclusion that Parson was not qualified to become a foreman. This articulation is to include an examination of the comparative qualifications of nonblacks promoted to foreman.
 
 
 27
 The District Court Judge's finding is also tainted by an incorrect understanding of the legal principles applicable to individual claims of racial discrimination in employment. It is clear law in this Circuit and in the Supreme Court that statistics as to the racial composition of the defendant's work force must be considered in judging individual allegations of discrimination. Dothard v. Rawlinson, 1977, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, 798; International Brotherhood of Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 417; McDonnell Douglas Corp. v. Green, 1973, 411 U.S. 792, 805, 93 S.Ct. 1817, 36 L.Ed.2d 668; Peters v. Jefferson Chemical Co., 5 Cir., 1975, 516 F.2d 447, 450-51, Burns v. Thiokol Chemical Corp., 5 Cir., 1973, 483 F.2d 300, 306. Parson presented evidence showing a marked disparity between the number of black hourly employees and the number of black foremen at the time he sought his promotion. The three black foremen employed at that time were restricted to the supervision of janitors, a situation that did not change until the next year. There is no mention of these figures in the District Court's findings or conclusions, leaving us with no assurance that the evidence was accorded the probative value it was due. Indeed, the Judge's statement that "other black men have been made foreman" indicates that he gave little, if any, weight to the evidence of statistical disparities. Moreover, the two individuals the Trial Court Judge identified as black supervisors were appointed in 1969 and 1973 long after Parson applied for and was denied a promotion.
 
 
 28
 Finally, we agree with Parson's contention that the District Court Judge erred in ignoring the impact of the procedure for awarding promotions that was in effect at the time Parson's application was denied. The Judge found that "(t)he process for the selection of a foreman . . . is untainted by any overtones of racial discrimination." However, the process described in the finding does not correspond to that in effect in 1966, but rather to the procedure as revised in 1972.[22] At the time Parson made his request, Kaiser gave shift foremen veto power over any applicant; required each applicant to take two written tests; and specified no substantive criteria for guiding selections.[23] The procedure in effect at the time relevant to Parson's claim evidences many of the characteristics that we have long held violative of Title VII. In Rowe v. General Motors Corp., 5 Cir., 1972, 457 F.2d 348, 358-59, we found that the following aspects of a promotion procedure were invalid:
 
 
 29
 (i) The foreman's recommendation is the indispensable single most important factor in the promotion process.
 
 
 30
 (ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations.)
 
 
 31
 (iii) Those standards which were determined to be controlling are vague and subjective.
 
 
 32
 (iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.
 
 
 33
 (v) There are no safeguards in the procedure designed to avert discriminatory practices.
 
 
 34
 These factors result in "procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman." They are therefore "a ready mechanism for discrimination against Blacks." Id., at 359; see also, Jenkins v. Caddo-Bossier Assoc. for Retarded Children, 5 Cir., 1978, 570 F.2d 1227, at 1229; Pettway v. American Cast Iron & Pipe Co., 5 Cir., 1974, 494 F.2d 211, 239-41. The District Court Judge clearly erred in judging Parson's individual claim as if his promotion request had been processed under a procedure adopted six years later. We remand for a reevaluation under the standards that existed in 1966.
 
 
 35
 B. Discrimination Against The Class: Promotions To Foreman
 
 The District Judge found that:
 
 36
 the evidence quite clearly demonstrated that blacks occupy many salaried positions at the Chalmette Works. There was no evidence indicating any present effects of any past discrimination which may have existed and the evidence relating to the selection process for foreman currently in operation at the Chalmette Works revealed no obstacles, overt or subtle, which prevent blacks from being promoted to the position of foreman. In fact, the very selection process that permits an individual to initiate his application for foreman and to be reviewed by a diversified Selection Committee contains appropriate safeguards to insure that blacks will be given consideration equal to that of whites.
 
 
 37
 On the basis of this finding, the Judge concluded that Kaiser had not discriminated against the class in the selection of foremen since the effective date of Title VII. In so holding, the Judge ignored the continuing effects of the pre-1972 procedures for the selection of foremen; ignored the statistics relied on by the plaintiff to document these effects; and ignored testimony as to individual instances of discrimination. The incorrect legal foundation for the Court's finding requires us to reverse and remand.
 
 
 38
 We have already described the procedures for selecting foremen at Kaiser and some of the similarities between the procedures used prior to 1972 and those condemned in Rowe. After the effective date of Title VII, Kaiser's method of selecting foremen granted veto power to immediate supervisors, provided hourly employees little information as to the necessary qualifications for promotion; provided those making the decisions no written standards or criteria for guidance; incorporated a personnel test since found discriminatory in impact in a number of Title VII cases,[24] and provided insufficient safeguards for avoiding the influence of discrimination. In 1972, on "the eve of trial," Rowe v. General Motors Corp., 457 F.2d at 359, Kaiser did alter its promotion procedures in ways that promise to mitigate the likelihood of discrimination. However, as we have noted before, "actions taken in the face of litigation are equivocal in purpose, motive and permanence," James v. Stockham Valves & Fittings Co., 5 Cir., 1977, 559 F.2d 310, 325 n.18, cert. denied, 1978, --- U.S. ----, 98 S.Ct. 767, 54 L.Ed.2d 781, quoting Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28, 33, and do not redress the grievances of those injured by the previous practices.
 
 
 39
 While the 1972 revisions of the selection procedure are laudable, we do not find sufficient evidence in the record to convince us that these procedures are not discriminatory in operation, although fair in form. The record does not clearly describe the contents of the evaluation form used in the selection process,[25] and testimony as to the weight accorded the different criteria specified indicates that they may remain susceptible to the exercise of great discretion.[26] On remand, the District Court should determine whether the evaluation method places undue reliance on general character traits, such that complete subjectivity remains likely. See Wade v. Mississippi Cooperative Extension Service, N.D.Miss., 1974, 372 F.Supp. 126, aff'd in relevant part, 5 Cir., 1976, 528 F.2d 508.
 
 
 40
 The District Court's evaluation of the likelihood of injury suffered by members of the class by the pre-1972 promotion procedures was a finding that "blacks occupy many salaried positions" at the plant. This ignores the statistical context provided by the plaintiff. We have sketched the disparities between the numbers of black hourly and black salaried employees, and between black and white salaried employees.[27] The paucity of black foremen and the concentration of blacks in nonsalaried positions constitute a substantial statistical discrepancy that could alone establish a prima facie case of unlawful racial discrimination. International Brotherhood of Teamsters v. United States, 1977, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396; James v. Stockham Valves & Fittings Co., 5 Cir., 1977, 559 F.2d 310, 329; Wade v. Mississippi Cooperative Extension Service, 5 Cir., 1972, 528 F.2d 508, 516-17; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, 442, 446, cert. denied, 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815.[28] Moreover, the statistical patterns do not complete the plaintiff's case. In addition to Kaiser's use of invalid procedures through 1972, the acknowledged presence of pre-Act discrimination, and the statistical discrepancies, Parson presented testimony by individuals of their experiences under these procedures. As the Supreme Court noted in Teamsters, supra, 431 U.S. at 339, 97 S.Ct. at 1856, "(T)he individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life."[29]
 
 
 41
 We conclude that the plaintiff's evidence of racial disparities in promotions to foreman after 1965, the exclusion of blacks from such positions prior to 1965, subjectively based promotion decisions by white supervisors after 1965, and the testimony by individual class members of discrimination they suffered, make a prima facie case of discriminatory practices in the selection of foremen. The District Court Judge erred in dismissing this aspect of plaintiff's case.[30] On remand, the "onus of going forward with the evidence and the burden of persuasion" is now on Kaiser. James v. Stockham Valves & Fittings Co., supra, 559 F.2d at 331; United States v. Hayes International Corp., 5 Cir., 1972, 456 F.2d 112, 120.
 
 
 42
 C. Discrimination Against The Class: Interdepartmental Transfers
 
 
 43
 Plaintiff's appellate attack on the transfer system at the Chalmette plant is focused on the requirement that employees transferring to another department must enter at the lowest level job in the new department, with a likely accompanying reduction in pay.[31] The District Court Judge made the following findings as to the present system governing transfers:
 
 
 44
 (T)his court finds that the seniority system employed by Kaiser does not "limit the employment and promotional opportunities of Negro employees" nor does Kaiser deny "Negro employees the same rights of transfer".
 
 
 45
 Although there was some testimony to the effect that blacks were excluded from some departments in the early 1950's, it was shown that by 1956, black employees had begun to transfer to almost every department at the Chalmette Works. There was also uncontroverted evidence that plant seniority was established for all purposes within the production departments by 1962 and that the same principle was applied in the craft departments by 1965. It was further shown that the seniority system in effect since 1962 allowed any employee to bid for a vacancy within his department on the basis of his total continuous plant seniority. It was further shown that, although there are lines of progression in the various departments, an employee is not required to bid up the line job by job, but rather he may bid to any job in the department for which there is a vacancy and in so doing may move around other employees who are junior to him by plant seniority. It was further shown that an employee wishing to transfer between departments, who is a successful bidder, enters the new department for a 10-day trial period and if he decides that he does not like the department or the job to which he has transferred, he has a right to return to his former job without losing any seniority. On the other hand, if he wishes to stay in the new department, after expiration of ten day period, the employee is free to bid on the basis of his qualifications and plant seniority on any vacanty in that department. The evidence established beyond a doubt that many black employees have taken advantage of these transfer opportunities and have rapidly advanced to higher paying jobs.
 
 
 46
 This Court finds that the method of transfer from department to department at the Chalmette Works does not discriminate against the class. This Court further finds that there is no loss in an employee's seniority as a result of his transferring between departments and that there is full plant seniority carryover on all such transfers. It should also be noted that a substantial number of black employees, who testified at the trial, had reached the top jobs in their respective departments prior to the passage of the Civil Rights Act of 1964. Such evidence clearly illustrates that the seniority system, as developed through the collective bargaining process, does not now nor did it historically exclude blacks or other employees from utilizing their plant seniority for transfer and promotion at the Chalmette Works.
 
 
 47
 The Judge's findings as to the role of plantwide seniority are not challenged here. We recognize that the relatively early adoption of plantwide seniority that is carried with an employee who transfers between departments places Kaiser's system above many that we have seen in this Court. E. g., James v. Stockham Valves & Fitting Co., 5 Cir., 1977, 559 F.2d 310, 317. However, we do not believe that the trial judge adequately responded to the plaintiff's assertion that the ten-day bottom entry requirement hampered the advancement of black employees from the laborer positions to which past practices once restricted them. We therefore reverse and remand.
 
 
 48
 The difficulty with the bottom entry requirement is that the transferring employee must remain in the spare or lowest position for ten days or until a vacancy in a higher job becomes available. Such a vacancy may arise within twelve days after the transfer. The discriminatory vice rests in the danger that a vacancy may not arise for months, or even years. We have held that similar plans that restrict transfer to entry level jobs and limit advancement to upper level jobs to persons already in the department are invalid. See United States v. Hayes International Corp., 5 Cir., 1972, 456 F.2d 112, 117. Such a system gives the old seniority criterion a continuing discriminatory effect; blacks are kept at a disadvantage begun by the past practices that kept them out of the nonlaborer departments. Because the ten-day period in the spare position is a minimum rather than a maximum requirement, it does not sufficiently distinguish Kaiser's system from those we have found defective. We hold that the District Court's finding is based on a mistaken understanding of what constitutes the "present effects of past discrimination," and cannot stand.
 
 
 49
 Kaiser and the Union attempted to justify the bottom entry requirement by arguing that it trains transferring employees and allows them an opportunity to determine if they wish to remain in the new department. (R., Vol. IX, Doc. 191, at 113 (testimony of Kaiser's Industrial Relations Superintendent).) This argument invokes the so-called business necessity justification, which "except(s) those few employment practices, which are non-intentionally discriminatory or neutral, but perpetuate the consequences of past discrimination, because of their overriding business necessity." Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 244 (emphasis in original).[32] However, this doctrine is very narrow. A practice which is demonstrably discriminatory in impact must:
 
 
 50
 not only foster safety and efficiency, but must be essential to that goal. United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). In other words, there must be no acceptable alternative that will accomplish that goal 'equally well with a lesser differential racial impact.'
 
 
 51
 Id., at n.87. In evaluating Kaiser's argument, the District Court Judge did not give sufficient consideration to whether the bottom entry requirement met this standard. On remand, this assessment must be made.
 
 
 52
 A Union is jointly liable with the employer for discrimination caused in whole or in part by the provisions of a collective bargaining agreement. See Carey v. Greyhound Bus Co., 5 Cir., 1974, 500 F.2d 1372; United States v. United States Steel Corp., 5 Cir., 1975, 520 F.2d 1043 cert. denied, 1976, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77. The transfer and bidding policies that we find deficient were part of the Supplement Seniority Agreement between Kaiser and the Union. (Appendix, Vol. II, at 288-292.) As the representative of the black employees, the Union is charged with the duty of protecting them from invidious treatment. "(I)t would be difficult to fasten liability on one party to the labor contract which was a substantial cause of the discriminatory employment practices and grant total immunity from such liability to the other party." Johnson v. Goodyear Tire & Rubber Co., 5 Cir., 1974, 491 F.2d 1364, 1381. Any monetary liability imposed upon the employer must be shared by the Union. See Albemarle Paper Co. v. Moody, 1975,422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280; United States v. United States Steel Corp., 5 Cir., 1975, 520 F.2d 1043; Myers v. Gilman Paper Co., 5 Cir., 1977, 544 F.2d 837, modified, 556 F.2d 758, cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59.
 
 D. Entry Into Craft Positions
 
 53
 After the plaintiff presented evidence as to the requirements conditioning entry to the crafts and the racial composition of the craft categories, the District Court found that: the testing procedures had been eliminated in 1968 and no evidence suggested "that but for the use of the tests prior to 1968, any member of the class would have obtained a higher paying position"; "the requirement that applicants for crafts positions possess some experience does not discriminate against the class"; and no evidence showed that Kaiser's "methods of training discriminated against the class." Because the District Court failed to consider critical aspects of plaintiff's evidence and applied incorrect legal principles, these findings must also be reversed.
 
 
 54
 The District Court Judge again appears to have ignored the statistical evidence. The plaintiff presented figures showing that in 1973, less than 3 percent of Kaiser's craftsmen were black. These numbers, when placed against the information as to the percentage and number of blacks among the hourly employees, are entitled to critical, if not dispositive weight, in assessing whether plaintiff has shown a prima facie case of discrimination. The plaintiff's argument is that these statistics demonstrate that Kaiser's practices with regard to selection of craftsmen contain elements of present discrimination and facially neutral policies that perpetuate past bias in hiring for craft positions.
 
 
 55
 Several of the incidents of past bias are recent use of the Wonderlic Test through 1968, a written test until after 1968, and the requirement of a high school diploma. The practice challenged here is the requirement of prior industrial experience. Under Title VII, practices and procedures "cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs v. Duke Power Co., 1971,401 U.S. 430, 91 S.Ct. 879, 853, 28 L.Ed.2d 158. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." Id., 401 U.S. at 431, 91 S.Ct. at 853. The statistical evidence, with the testimony by individual members of the class as to obstacles they encountered in seeking entry to the crafts, requires the conclusion that the plaintiff made a prima facie showing that the current system, with its prior experience requirement, is discriminatory in effect. Kaiser therefore has the burden of showing that the prior experience requirement has "a manifest relationship" to the legitimate needs of the craft positions.[33] Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. at 854; see also United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418.
 
 
 56
 The plaintiff also challenged the District Court's dismissal of the claim of discrimination with regard to training programs for the crafts. At the time of trial, Kaiser imposed testing and educational requirements on applicants to the training programs, requirements which presumptively account for the disparities between the number of black and white craft trainees. Again, this is sufficient to give Kaiser the burden of showing that these eligibility requirements are justified by the needs of the programs. Pettway v. American Cast Iron Co., supra. The District Court erred in dismissing this claim.
 
 IV. Remedies
 
 57
 We have held that the District Court erred in dismissing the individual and class claims at the close of the plaintiff's case. On remand, the Trial Judge must determine the best method of completing the proceedings. However, the defendants should be allowed to present their evidence, and the District Court should give the plaintiff an opportunity to supplement the present record, in chief or by rebuttal, without being required to offer again the evidence already introduced.[34]
 
 
 58
 Because of the likelihood that practices may have altered since this case was first tried, and because the law has also changed, the District Court on remand must reexamine the evidence in light of the present law allocating burdens of proof in individual and class claims of employment discrimination in determining the existence of liability and the scope of necessary relief. However, the District Court must remain conscious that while Kaiser's recent affirmative action programs and modifications in past practices will clearly shape the nature of any prospective, injunctive relief,[35] they do not absolve Kaiser or the Union of liability for the injuries suffered by members of the class from the continuing impact of past discrimination. As we have clearly held, "(o)nce a court has determined that a plaintiff or complaining class has sustained economic loss from a discriminatory employment practice, back pay should normally be awarded unless special circumstances are present." Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211, 252-53; Albemarle Paper Co. v. Moody, 1975, 422 U.S. 405, 413-425, 95 S.Ct. 2362, 45 L.Ed.2d 280; Johnson v. Goodyear Tire & Rubber Co., 5 Cir., 1974, 491 F.2d 1364, 1380.[36]
 
 
 59
 Plaintiff also claims that the appropriate remedies for discrimination in transfers and promotions are those designed to place the black employee in the position he would have occupied but for the discrimination suffered that is, his "rightful place."[37] We agree that this comports with the "make whole" approach of Title VII. Because of the early termination of the proceedings below, the District Court did not consider whether such remedies were necessary. On remand, the District Court is directed to consider the "rightful place" theory, particularly with regard to the plaintiff's complaint concerning the transfer system, in determining the need for and the scope of relief.
 
 
 60
 REVERSED and REMANDED.
 
 
 
 *
 Of the U. S. Court of Customs and Patent Appeals sitting by designation
 
 
 [1]
 At the time legal proceedings began, Local 225 was the bargaining representative for Kaiser's employees. Several replacements and mergers have occurred since that time, resulting in two changes in bargaining representative. These changes were reflected in additions to the party defendants named in the litigation. The present representative is Local 1300, United Steelworkers of America, AFL-CIO, CLC, named as a defendant and now an appellee in this suit
 
 
 [2]
 42 U.S.C. § 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [3]
 42 U.S.C.A. § 2000e-2 in pertinent part provides:
 "(a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 (d) It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.
 (h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.
 42 U.S.C.A. § 2000e-3 provides:
 (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 [4]
 The District Court Judge ruled that the class action was valid under F.R.Civ.P. 23(b)(2) and found that the class consisted of all black hourly employees working at the Chalmette plant at the time of trial, except those who had chosen not to be represented by the named plaintiffs
 
 
 [5]
 No appeal was taken from the dismissal of Arcell Williams' individual claim
 
 
 [6]
 In particular, plaintiffs do not contest the findings or conclusions that the following allegations were meritless: segregation in plant facilities; discrimination in promotion and advancement to nonsupervisory positions or positions outside the crafts; discrimination in sanctioning infractions of plant rules; and discrimination in the composition of the "lay-off pool."
 
 
 [7]
 Our understanding of the organization of the plant and the details of its operation is somewhat hampered by the absence of defendants' evidence and by the state of the record that does exist, which, as the plaintiff's brief concedes, is highly disorganized
 
 
 [8]
 Discrimination prior to the effective date of Title VII, July 2, 1965, can be considered under two theories. Since the appellant's allegations are also made under 42 U.S.C.A. § 1981 employment practices prior to 1965 may be examined. Secondly, this court specifically explained in United States v. Jacksonville Terminal, 451 F.2d 418, 441 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972) . . . that pre-act discriminatory conduct is highly relevant, especially, when considering neutral practices under Title VII alleged to carry forward past discriminatory effects
 Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211, 218 n. 10.
 
 
 [9]
 The "Foreman Selection Programs" for 1966, 1967, 1968, and 1970 are set forth in Appendix, Vol. II, at 183-93, Plaintiff's Exhibit 52-55
 
 
 [10]
 In May 1967, the EEOC found reasonable cause to believe that the Wonderlic Test discriminated against black employees. Kaiser's subsequent validation study revealed that twice as many blacks failed the test as whites and that the test did not accurately predict job performance for either race. See Plaintiff's Exhibit 67
 
 
 [11]
 Kaiser and the Union contest the use of these statistics in Parson's brief to this Court, claiming that the figures are drawn from material never introduced into evidence, including answers to interrogatories, deposition testimony, and EEOC reports. Plaintiff admits that the data concerning the total number of foremen serving on a given date were drawn from Kaiser's answers to interrogatories not admitted into evidence. However, the information concerning the date and details of the appointments of black foremen is based on testimony and documents that were put in evidence at the trial. Plaintiff contends that the comparisons between these figures and the numbers concerning the total number of foremen can be drawn, in "somewhat less exact form," from Kaiser's Affirmative Action Report, which was introduced into evidence. Plaintiff's Exhibit 67. We have reviewed the record and are satisfied with the plaintiff's response
 
 
 [12]
 Four of the eight black supervisors were in charge of janitorial workers; only one supervisor of janitors was white
 
 
 [13]
 Because one of the black foremen selected before 1971 had taken disability leave and a second had transferred to a nonsupervisory position, only ten black foremen chosen under the pre-1972 procedures were working at the plant at the time of trial
 
 
 [14]
 During this period, the laborer and porter positions were held exclusively by blacks. The lowest position for which white employees were hired was that of "spare." Testimony of Isadore Booker; testimony of J. B. Sims, R., Vol. VII
 
 
 [15]
 This system does not apply to those jobs for which prior service in another, related position in the department is a prerequisite for bidding
 
 
 [16]
 The plaintiff's brief lists the craft categories at issue as electrician, lagger, lineman, instrument repairman machinist, mechanic, painter, welder, air conditioning mechanic, automotive mechanic, blacksmith, bricklayer, and carpenter. This list does not include skilled positions that are filled by bidding on the basis of seniority rather than by hire or transfer. See note 19, infra
 
 
 [17]
 Kaiser did not require craftsmen who began work before the test was adopted to take the examination. All the exempt craftsmen were white
 
 
 [18]
 See note 10, supra
 
 
 [19]
 The figures in Kaiser's report include skilled production jobs that plaintiff does not group with the craft categories involved in this appeal. Plaintiff complains of discrimination only in the entry requirements of those craft positions filled by hire or transfer rather than by bidding on the basis of seniority. Kaiser's "skilled craftsmen" count results in different numbers but similar ratios:
 1967 - 629 white 4 black
 1968 - 648 white 16 black
 1969 - 655 white 24 black
 1970 - 606 white 19 black
 1971 - 591 white 23 black
 Plaintiff's Exhibit 19.
 
 
 [20]
 See Plaintiff's Exhibit 19
 
 
 [21]
 Parson's shift foreman, Jim Saucier, his general foreman, Jim Cruse, and the superintendent of the Metal Products Department, Paul Petit, testified at trial or through depositions introduced as evidence as to their reasons for denying Parson the promotion. Reports and memos by Saucier, Cruse, and Jim Mayeaux, who served as Parson's foreman for a short time during the relevant period, both contemporaneous with the decision against promoting Parson and prepared later in connection with EEOC proceedings or this suit, were also introduced. These sources contain several different grounds for Parson's failure to obtain his promotion, including inadequate performance as a furnace operator; inability to accept criticism; lack of loyalty to Kaiser; difficulties Parson might encounter with white subordinates; inability to take orders; and inability to plan well. R., Vol. II, 91-102, 104-116. Parson contests the validity of some of these statements, attacks others as clear indications that he was not promoted because of his activities in attempting to desegregate the plant facilities (he lacked "loyalty" to the company, criticized the company, and could not "get along" with people); and identifies others as pretexts for racial discrimination. While the District Court Judge clearly has the task of evaluating the credibility of conflicting evidence and witnesses subject to the clearly erroneous rule, e. g., Bolton v. Murray Envelope Corp., 5 Cir., 1974, 493 F.2d 191, 193-94, his failure to make any factual findings as to why Parson was not qualified for the position of foreman makes it impossible for the plaintiff to attack or for us to review the result under the proper standard
 
 
 [22]
 The District Court Judge found that:
 The process for the (selection of a foreman) by Kaiser is untainted by any overtones of racial discrimination. Although the post of foreman is not controlled by the Collective Bargaining Agreement, as vacancies occur they are posted on the plant bulletin board and any employee can initiate, on his own behalf, an application for consideration as foreman. All applications for foreman are considered by a review board. Individuals who have initiated an application are reviewed and evaluated by a Management Committee composed of: the Industrial Relations Superintendent, the Employee's Supervisor, the Departmental Supervisor where the vacancy exists, the plant manager or his designee, and a Black representative.
 The procedure described here corresponds to that adopted by Kaiser in 1972.
 
 
 [23]
 Jim Cruse, Parson's general foreman, gave the following testimony as to the procedure followed in deciding Parson's request:
 Q. Now, Parsons I take it discussed with you his, that is Parsons, becoming foreman during this period?
 A. Right.
 Q. When was the first time? I assume it was more than once.
 A. Yes. We had several discussions. First time was first part of June in 66. And one night, as I was leaving, he approached me and said he understood there was a policy on making foreman and he would like to apply for foreman job. . . . When he came back on the day shift Friday, we talked about it and I had been aware of the fact that there was a written policy on foreman selection which had been communicated to me, oh about a month before that.
 Q. How long had there been a written policy for foreman?
 A. I'd say a month or two.
 Q. Prior to that, what was the procedure for becoming foreman?
 A. It was essentially the same as what was in the written policy.
 Q. What was that?
 A. A recommendation was made by a shift foreman to a general foreman on a (man's) performance, or a man had an expressed interest on being foreman, he then made his recommendation to the general foreman and they would discuss and evaluate it and review it with the superintendent. . . .
 Q. Alright. Now, you say you would discuss it with him when he came back on Friday?
 A. Right. O.K. so I checked out the I went back to the policy and reviewed it. And started off from the beginning, where we have the recommendation from the foreman and you get recommendations from previous foremen. . . . I told his foreman that Parsons had talked to me about it.
 Q. Who was this?
 A. Jim Saucier (Parson's shift foreman). And that I wanted him to think about it and make a recommendation. . . . And the recommendation came in "no". (R. Vol. II., Doc. No. 52C at 11-15.)
 
 
 [24]
 See, e. g., Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Johnson v. Goodyear Tire and Rubber Co., 5 Cir., 1974, 491 F.2d 1364
 
 
 [25]
 The following testimony was given concerning the evaluation form:
 Q. (By Mr. Douglas) Is there some basic standard that governs your determination as to whether a man will or will not be made a foreman?
 A. I would have to say there are some basic considerations. It starts all the way from a man's absentee record, safety record, his quality to work as evidenced by either a lack or in fact proof of reprimand or counsellings due to poor workmanship or inability to get along with fellow workers or things of this nature. The individual's apparent ability to communicate or converse, be understood, his manner, his apparent desire to be foreman. . . .
 Q. Are these requirements documented anywhere?
 A. I believe there's a form that we check off which I think is available in personnel.
 Q. It's available to whom?
 A. To the members of the committee who are evaluating the individual.
 Q. Are those the essential qualities that you would look for before you would endorse a man for the job of foreman?
 A. I'm trying to indicate here that leadership, which is hard to find, is involved in there, but it is pretty hard to define. But, yes, I believe those are the qualifications that I would look for.
 (R., Vol. VIII, Doc. No. 187 at 72-73, 76.)
 
 
 [26]
 The following testimony was given concerning the weight given the constituent factors:
 Q. Is there any flexibility, or how is a man rated, for example, on the chart? Is there a quality of points given?
 A. No, it isn't that statistically designed. It's a question of mostly yes or no type of questions.
 Q. Give me an example?
 A. Well, is there any evidence this individual has character stability, yes or no. Is he able to communicate properly, yes or no. This type of thing.
 Q. Is there any grade?
 A. One through ten, that type of thing?
 Q. Yes.
 A. No.
 Q. Is there a specific number of qualities that he must possess before he passes or fails?
 A. Not really. At the end of the form, which is really an interview form, you have a place where the consensus of the committee is should be considered or should not be considered. . . .
 (Id. at 80-81.)
 
 
 [27]
 Plaintiff was unable to provide record data with which to estimate turnover among foremen after 1965. However, proof of turnover is not part of a prima facie case of discrimination. Rather, the defendant has the burden of proving a lack of turnover to justify a failure to hire minorities. Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211, 233
 
 
 [28]
 This Court has observed that the significance of statistical disparities between the races "is magnified when appraised in light of the fact that (the defendant's decision on promotions are) . . . almost exclusively a subjective determination made by white supervisors." Bolton v. Murray Envelope Corp., 5 Cir., 1974, 493 F.2d 191, 195
 
 
 [29]
 See, e. g., the testimony of Roosevelt Jackson, Ronald King, and Isadore Booker, concerning their attempts to secure promotions to supervisory positions. (R., Vol. VI, Vol. VII.)
 
 
 [30]
 Kaiser asserts that even if the plaintiff has established a prima facie case as to any claim, more is necessary to withstand a Rule 41(b) motion for involuntary dismissal. Under the standard urged, the trial judge should "evaluate the evidence without making special inferences in the Plaintiff's favor . . . and (should) resolve the case on the basis of preponderance of the evidence." Emerson Electric Co. v. Farmer, 5 Cir., 1970, 427 F.2d 1082, 1086
 We agree that Rule 41(b) allows a trial judge to make findings of fact at the close of a plaintiff's case. However, this does not respond to the flaw in the findings of fact before us here. Because the Judge applied incorrect legal principles, we are unable to credit the fact findings that were made. Kaiser's argument does not remove the necessity for a remand.
 
 
 [31]
 Plaintiff relies on Kaiser's 1970 Seniority List, Plaintiff's Exhibit 19, to show examples of blacks who have high seniority in the nonproduction departments to which they were discriminatorily assigned during the 1950s. These employees hold jobs that pay at a higher rate and require less arduous manual labor than the entry jobs in the production departments
 
 
 [32]
 See also, Griggs v. Duke Power Co., 1971, 401 U.S. 424, 431-32, 91 S.Ct. 849, 28 L.Ed.2d 158; Local 189, United Papermakers & Paperworkers v. United States, 5 Cir., 1969, 416 F.2d 980, cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, 453, cert. denied, 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815
 
 
 [33]
 An argument based on business necessity to validate the prior experience requirement in spite of differential effects on blacks and whites must meet rigorous standards. See Watkins v. Scott Paper Co., 5 Cir., 1976, 530 F.2d 1159, 1168, 1179-83, cert. denied, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139; Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211
 
 
 [34]
 For a general discussion on retrial after a reversal of a Rule 41(b) dismissal following the plaintiff's case-in-chief, see Riegel Fiber Corp. v. Anderson Gin Co., 5 Cir., 1975, 512 F.2d 784, 793
 
 
 [35]
 In the recent case of Weber v. Kaiser Aluminum & Chemical Corp., 5 Cir., 1977, 563 F.2d 216, for example, this Court considered a 1974 plan altering Kaiser's entry requirements for craft training positions in an affirmative attempt to recruit blacks into the crafts. In that case, indeed, this Court found that Kaiser went too far in its efforts to increase the number of blacks in skilled positions, resulting in a plan that violated Title VII by imposing a hiring quota of a minimum number of blacks in a plant where no prior discrimination could be shown
 
 
 [36]
 See Baxter v. Savannah Sugar Refining Corp., 5 Cir., 1974, 495 F.2d 437, 443-44, cert. denied, 1974, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308, for a description of the bifurcated burden of proof procedure followed in Title VII claims for class-wide back pay:
 (a) Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the class to establish that an employer's employment practices have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the class of black employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the covered class, has suffered financial loss, and thus (is) entitled to back pay or other appropriate relief.
 See also Sagers v. Yellow Freight System, Inc., 5 Cir., 1976, 529 F.2d 721, 734; Sabala v. Western Gillette, Inc., 5 Cir., 1975, 516 F.2d 1251, 1255; United States v. United States Steel Co., 5 Cir., 1975, 520 F.2d 1043, 1053-55.
 
 
 [37]
 Under that theory (the rightful place theory) blacks are assured "the first opportunity to move into the next vacancies and positions which they would have occupied but for wrongful discrimination and which they are qualified to fill." United States v. Georgia Power Co., 5 Cir., 1973, 474 F.2d 906. Thus blacks confined by discrimination to certain positions must be given the opportunity to transfer into the formerly "white" positions as vacancies occur in order to assume their "rightful place."
 Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 248; Sagers v. Yellow Freight System, Inc., 5 Cir., 1976, 529 F.2d 721, 730-31 (to be eligible for back pay, there is no need for a class member to have previously applied for a transfer "to positions that (he) reasonably knew to have been closed to (the) class.")