Harris A. PARSON and Arcell Williams

v.

KAISER ALUMINUM & CHEMICAL CORP., and Local 225, Aluminum Workers International Union, Chalmette, Louisiana.

Civ. A. No. 67–1257.

United States District Court, E. D. Louisiana.

Aug. 28, 1980.

Nils R. Douglas, New Orleans, La., Richard B. Sobol, Washington. D.C., for plaintiffs.

Carl J. Schumacher, Jr., New Orleans, La., for defendants.

BEER, District Judge.

This case is here on remand. *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374 (5th Cir. 1978). The appeal which resulted in this remand followed from or-

ders entered by District Judge Fred J. Cassibry, dated March 29, 1973, and May 23, 1978, dismissing individual and class claims based upon racial discrimination in employment. The Fifth Circuit Court of Appeals reversed and remanded, July 10, 1978. On November 28, 1978, Judge Cassibry recused himself from further consideration of the case, and the matter was, thereafter, reallotted to Judge Morey L. Sear. Subsequently (September 12, 1979), this case was reallotted to this section (Section "M"), although this section was not actually activated by the swearing in of a district judge until December 7, 1979.

Thereafter, on December 14, 1979, this court set a preliminary pretrial conference for December 28, 1979. At that conference, a final pretrial conference was set for March 18, 1980, and the trial date was set for April 21, 1980. Notwithstanding defendant's motions to continue, trial commenced as scheduled. After five days of trial (April 21–April 25, 1980), the record was complete and the defendant was given the opportunity to file a post–trial brief by June 15, 1980. Plaintiff was given the opportunity to respond by August 1, 1980. Both have done so within the time limits.

During the course of the trial, the parties entered a stipulation with respect to the "interdepartmental transfer" issue which has removed that issue from the case. *Parson*, at p. 1380. Thus, the three remaining issues here dealt with are: (1) Kaiser's alleged promotion discrimination against Parson; (2) Kaiser's alleged promotion discrimination against a not yet complete or clearly defined class; and (3) Kaiser's alleged discrimination in providing training and opportunities for entry to various craft positions at the Kaiser plant.

This court's pretrial order of March 18, 1980, provides, in accordance with a stipulation by all parties, that the issue of Kaiser's liability would be tried and decided separately from the issue of any remedy or remedies required thereby and further provided that the issue of liability would be limited to a consideration of the period from July 2, 1965 (Title VII commences) to March 1, 1973 (original trial commences).

## FINDINGS OF FACT WITH RESPECT TO ISSUES (1) AND (2)

1. At all times pertinent, Harris A. Parson was an employee of defendant Kaiser at its plant in Chalmette, Louisiana. He is black.

2. By order dated May 23, 1974, the district court (Judge Cassibry) provisionally certified a class comprised of the black hourly employees employed at Kaiser at the time of trial, with the exception of those individuals who "opted out" of the class, as listed in Appendix A of the pretrial order.

3. This is an action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and pursuant to § 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. This court has jurisdiction over the claims under Title VII, pursuant to § 706(f)(3) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(3). Jurisdiction over the action under 42 U.S.C. § 1981 is based on 28 U.S.C. § 1343(4).

4. As a result of stipulations between the parties, the following facts are manifest:

a. The Kaiser Chalmette plant was, at all times pertinent, engaged in the production of aluminum. Kaiser opened the Chalmette works, located in St. Bernard Parish, Louisiana,[1] in 1951. (PTO p. 11.)

b. In 1956, Kaiser commenced the employment of blacks in its production department. (Vol. IX, Doc. 191, p. 13.) Entry into employment in the production department was conditioned upon passage of the Wonderlic Test (dropped in 1968) and upon *departmental* seniority in bidding for advancement, which was changed to *plant* seniority in 1962. (Testimony of Lewis Albright, 4/22/80.)

---

1. St. Bernard Parish is located south of New Orleans. In 1951, this parish was one of the most segregated and racially divided parishes in Louisiana. That tradition, and many results that are directly or indirectly related thereto, continued, perhaps in diminished intensity, up to and through all times pertinent.

c. Prior to October, 1965, all foremen at the Chalmette works were white. (PTO p. 11.)

d. In July, 1965, there were 209 supervisors at the Chalmette works; all were white. At that time, approximately 15% of Kaiser's 1,873 hourly production workers were black. (PTO p. 11.)

e. Nine blacks were prompted to shift foreman jobs between July 2, 1965, and September 3, 1971. Four of these were assigned to the Building Services Department. (PTO p. 12.)

f. As of September 3, 1971, there were 164 shift foreman at the Chalmette works. Eight were black; four of these foremen were in the Building Services Department. (PTO p. 12.)

g. In September, 1971, approximately 21% of the hourly employees at the Chalmette works were black. (PTO p. 12.)

h. Of the 164 shift foreman positions on September 3, 1971, 56 were appointed after July 2, 1965. (PTO p. 12.)

i. Prior to April, 1966, there were no specific written procedures governing the selection of foreman. (PTO p. 12.)

5. Kaiser's procedures for selecting foreman have changed markedly since 1965. These procedures are summarized in *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d at 1379.

6. Applying the standards used to select a foreman that existed in 1966 (when Parson's first promotion request was denied), it was necessary for an employee to be recommended by his shift foreman in order to receive further consideration. Thus, the procedure was subjective as to the standards applied by various foreman in recommending production line employees for promotion to the position of shift foreman. Since there was no particular provision for the posting of any notice of foreman vacancies, or any other specific method to notify employees of a foreman vacancy, there was no accurate method of calling the attention of the production employees to the existence of foreman vacancies. *Parson*, at 1379. By 1967 (the date of Parson's second attempt to become a foreman), "the revised procedure required each foreman to submit the names of those employees who had indicated a wish to be promoted 'but whom the foreman believes do not have the qualifications.'" *Parson*, at 1379. Thus, an employee's application for promotion to a foreman position continued to be conditioned, at least to some degree, upon the subjective judgment of his shift foreman as far as his qualifications were concerned.

7. The following facts are pertinent to Harris Parson:

a. He was first employed at the Chalmette works in 1953. He was hired as a laborer in the Services Department. (PTO stipulation p. 11.)

b. In 154, Parson became a Porter in the Building Services Department. (Vol. X, Parson testimony p. 7.)

c. In 1960, Parson transferred to the Metal Products Department as a "spare." (Vol. X, Parson testimony p. 8.)

d. Between 1961 and 1963, Parson worked at several non–supervisory jobs in the furnace area of the Metal Products Department. The top–rated non–supervisory job in that department was furnace operator. In March, 1963, Parson sought to become and did, in fact, receive appointment as a furnace operator in the Metal Products Department. He remained at that job through the time of trial. (PTO stipulation p. 11.)

e. In June, 1966, Parson orally applied for a supervisory job as foreman in the Metal Products Department. Several days later, Parson was orally informed by the shift foreman, Jim Cruse, that his application for promotion to foreman had not been affirmatively acted upon and was rejected. (PTO stipulation p. 11.)

f. During this period and at all times pertinent, Parson had, at least to some noticeable extent, sought to involve himself in a leadership role among the black employees at the Kaiser plant in connection with various management–based attempts to eliminate racially segregated facilities at the plant. (Vol. X, Parson testimony pp. 12–32, pp. 46–48.)

g. At the time of Parson's application and rejection for promotion to a foreman job, there were no written standards as to qualifications for promotion to such supervisory positions. (PTO stipulation p. 11.)

8. But for the activities noted above, it is more likely than not that Parson would have, in the ordinary course of Kaiser's business operations, been, at the least, a reasonable prospect for promotion to foreman. The statistics noted above, as well as Parson's individual capabilities measured against the subjective standards for promotion, cited above, which were in effect at the time of Parson's rejection for promotion, support a prima facie finding that Parson, by August of 1967, would, more likely than not, have obtained at least provisional promotion to foreman. If there had been no racial overtones to be considered and taken into account in his selection and promotion, it is more likely than not that he would have been affirmatively considered.

9. Though Parson's immediate supervisors were justifiably not particularly impressed with Parson's work record, it is apparent that his efforts in his own behalf in seeking promotion were, to some extent, frustrated on the basis of his other activities at the plant. (See June 14, 1966, memo, Def.Exh. 101, p. 135, June 3, 1966, memo, p. 145, and Cruse memo, p. 104.)

10. By 1967, white employees who had considerably less seniority than Parson had been selected as shift foremen in the Metal Products Department. (Pl.Exh. 107, p. 4.) Thus, by August, 1967 (the date of Parson's second application for promotion to shift foreman), Parson would have been considered for and, more likely than not, subsequently promoted to the rank of foreman but for his activities above noted dealing with integration of the Kaiser facilities.[2]

11. Accordingly, on the basis of the mandate by which this court is governed, the burden shifted to Kaiser to show why, subsequent to Title VII, July, 1965, Parson was not promoted to shift foreman.

12. Thus, the focus of the court's consideration of the evidence shifts to a consideration of the business requirements of Kaiser to determine if they have a manifest relation to Parson's failure to achieve promotion. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

13. Kaiser *has* demonstrated valid business practices for the failure of Parson's promotion efforts in his own behalf but has failed to carry the heavy burden of proving that its selection practices as they concerned Parson were *essential* to recognized business goals of safety and efficiency. *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

14. Though there was existent at all times pertinent a fear on the part of the local Kaiser management officials that partially paralyzed and materially inhibited their ability to make valid operational judgments with respect to their work force, that fear, understandable though it may have been, was not a sufficiently valid basis for their actions vis-a-vis Parson.

15. Problems, both internal and external, which influenced the manner of dealing with the then existent racial situation, both from the standpoint of the work force itself as well as the outside community in which Kaiser was itself located, were intense. Top management at Kaiser was making a good faith effort with respect to job opportunity and job advancement for blacks at Kaiser but was confronted by real possibilities of slow-downs, sabotage and personal confrontations in connection with enforcement of these opportunities. Even, so, there is evidence of instances of de facto discrimination occasioned by timidness and

---

**2.** In this connection, it is important to note that Kaiser's reluctance in promoting Parson came not at all from the company's unwillingness to promote black employees because of any company-based prejudice. The reluctance was based upon other factors, such as the company's not necessarily misplaced fear that Par-

son's promotion would trigger a violent and prolonged (and, thus, expensive) reaction on the part of certain white, racially-motivated employees and the basic contention that Parson's absenteeism, etc., formed a questionable basis for eagerness to promote him to a supervisory position.

vacillation resulting from fear and concern for the overall plant operations. This de facto (though unintentional) discrimination is understandable and yet unacceptable. The management at Kaiser was understandably concerned about the reaction of its predominantly white labor force to the employment of black foreman and, because of this, was inclined, at least during the early and middle stages of this dilemma, to require greater abilities on the part of blacks seeking promotion than their white counterparts. Such misplaced concern seemed to be the case with respect to Isadore Baker, who, in the spring of 1967, probably had the requisite qualifications for promotion but, nevertheless, discovered that more was required of him because of his race and the closely related volatile situation that existed at the Kaiser plant. (Vol. VII, Doc. 183, p. 15.)

16. The same may be said to be true of Parson, who was neither an exceptionally well qualified nor a clearly unqualified furnace operator at the times pertinent. He was average. Perhaps his motivation and company loyalty were somewhat below average and perhaps his basic understanding of furnace operations (at least from the standpoint of length of actual experience with furnace operations) were somewhat above average. Perhaps the promotion to foreman of Parson, who had been both outspoken about and physically involved in Kaiser's own good faith efforts to commence a program of plant desegregation, could have been precipitous in a plant where racial tensions clearly existed. Even so, and acknowledging this court's incalculable advantage of looking back instead of being there on the firing line at the critical times here involved, it is the court's ultimate determination that Parson's promotion to foreman would, more likely than not, have come to pass by August of 1967 but for all of the problems above described. Very real problems confronted Kaiser, and that company can neither be censured nor greatly criticized for the methods which they then chose to deal with these problems. Nevertheless, their overall response visited a burden on Parson's quest for promotion

that was sufficiently disproportionate as to require a basic finding that they have not carried the burden imposed by the reviewing court in this case.

17. Further, that burden has not been sufficiently met with respect to the yet fully defined class. Even so, this observation is, I believe, necessary:

It borders on practical impossibility for any adjudicatory agency (special master, judge, magistrate) to fairly reconstruct the "but for" status of various informal applicants for foreman promotions during the critical time period with which we are here concerned. Yet, those complex issues are for another part of these proceedings and certainly for another day in view of the stipulation limiting the present focus to a determination of liability.

### FINDINGS OF FACT WITH RESPECT TO ISSUE (3)

1. Kaiser's Chalmette Plant is involved in a complex manufacturing process requiring employees who are skilled in many and varied crafts to maintain it on a daily operational basis. During the period July, 1965 to March, 1973, over 450 craftsmen were employed in two Kaiser maintenance departments known as Power Maintenance and Reduction Maintenance. The craft positions in Power Maintenance were: electrician, instrument repairman, lagger, lineman, machinist, mechanic, painter and welder. The craft positions in Reduction Maintenance were: air conditioning mechanic, automotive mechanic, blacksmith, bricklayer, carpenter, electrician, machinist, mechanic, painter, welder A and welder B. (PTO.)

2. Though various definitive steps had been taken by Kaiser to achieve integration of the physical facilities at the Chalmette Plant by 1965, a somewhat less effective and forceful campaign was instituted by Kaiser to bring qualified blacks into craft positions. That campaign, commenced in the 1967–1968 period did include such activities as placing recruiting ads in local papers, seeking referrals from within the

plant, soliciting help from the Urban League, talking to outside agencies and contacting the unions (Testimony of Richard Humphrey, Kaiser trial, 4/21/80; Ronald Radocovich, Kaiser trial, 4/21/80; Frank Krause, Kaiser trial 4/22/80), but it was not very effective insofar as practical results were concerned.

3. In July, 1965, there were approximately 460 persons employed at the Chalmette Plant in the various craft positions. Three of these positions were filled by blacks. (PTO, uncontested fact, 7q., p. 12, March 18, 1980.)

4. As of July, 1970, there were 468 persons employed in crafts positions at the Kaiser Plant. Eight of these positions were filled by blacks. (PTO, compilation of table, pg. 13.)

5. Of the 96 craftsmen in the Power Maintenance Department in July, 1970, 22 were hired after July 2, 1965. One of the 22 was black. (PTO, uncontested fact, 7s., pg. 14.)

6. Of the 365 craftsmen in the Reduction Maintenance Department on July 31, 1970, 65 were hired after July 2, 1965. Three of these 65 were black. (PTO, uncontested fact, 7t., pg. 14.)

7. In 1965, applicants for craft positions were required to have a high school diploma and prior industrial experience in order to be considered for the job. Applicants were further required to achieve a passing score on a short basic intelligence test known as the Wonderlic Test. This was a widely used industrial test which was considered to be an easy and accurate way to gauge the potential an applicant had for success at work. (Testimony of John Rome, 4/22/80; testimony of Lewis Albright, 4/22/80.)

8. Craft applicants who met the above criteria would, upon approval of the Maintenance Administrator, John Rome, qualify for a trial work period. Craft–type job applicants from the Chalmette Plant, who were tentatively accepted, then had a 10–day trial period; all other applicants tentatively accepted had a 30–day trial period. (Testimony of John Rome, 4/22/80.)

9. By 1968, use of the Wonderlic Test had been discontinued primarily because a validation study made in 1967 by Kaiser showed there to be a disproportionate passage rate (57% for whites and 28% for blacks), and no clear correlation between passage of the test and either turnover rate or general job performance. The requirement of a high school diploma was dropped a year later. (Testimony of Albright, 4/22/80.)

10. The industrial experience requirement continued in effect through March, 1973. This requirement was incorporated into the selection procedure in written form in 1967. (Testimony of Krause, 4/22/80.)

11. In 1968, the craft applicant selection method was revised. Kaiser commenced using *structured interviews* as a means of evaluating applicants, and craft–type job openings were posted. When posting took place, the senior *qualified* applicant (the senior applicant in terms of employment service with the requisite industrial experience) was, thereupon, interviewed. The structured interviews were conducted by the Maintenance Administrator, John Rome, and sought to bring an objective consideration of an applicant's knowledge regarding a specific craft. The interview was not graded in a traditional sense; it was instead designed to promote a dialogue between the applicant and the test administrator during which the applicant had an opportunity to orally develop the extent of his knowledge in a craft. (Testimony of John Rome, 4/22/80.)

12. Kaiser has affirmatively established that the industrial experience requirement was, on various occasions, waived or reduced for black craft applicants. However, although Kaiser perceived a dearth of qualified black craftsmen, they chose to make their main effort to remedy the problem by extensive recruiting. The lax application of the industrial experience requirement to encourage black entries to crafts positions followed no consistent or announced policy. (Krause testimony, 4/22/80; Rome testimony, 4/22/80; Humphrey testimony, 4/21/80.)

13. In rebuttal, plaintiffs sought to show that craft–type employment applications of many white employees, who, on the face of their applications, had not met the industrial experience requirement, were, nevertheless, hired into craft positions. (Pl. exh. 114–124.) Thus, they contended that the lax application of the industrial experience requirement hindered more than helped insofar as black applicants were concerned. I do not find this contention to have been proven.

14. Aware that the procedures above described were not achieving positive results with respect to employment of blacks in craft positions, Kaiser also initiated an on–the–job training program as an alternative manner of stepping up the rate of black employee entry to the crafts. This on–the–job training program involved electricians and instrument repairmen and mechanics. The trainee electricians and instrument repairmen were required to have a high school diploma or equivalent in order to participate, and trainee mechanics were required to have finished two years of high school. The program also required applicants to pass a General Aptitude Test administered by the Louisiana State Employment Service. (Pl. exh. 110, Kaiser attachment dated April 24, 1969, describing on–the–job training.)

15. Since the reviewing court had already concluded that the procedures noted above constituted prima facie discrimination, Kaiser, on remand, bore the burden of proving otherwise. (*Parson,* supra, pg. 1390.)

16. Given the appellate court's determination of prima facie discrimination as to these procedures, Kaiser's specific burden was to offset the prima facie conclusion reached by the reviewing court by proving that these requirements had a manifest relationship to the legitimate needs of the crafts positions. (*Parson,* supra, pg. 1390.)

17. I find that Kaiser's various requirements noted above (including prior industri-al experience) may well have been necessary to accomplish the ultimate goals of plant safety and employee welfare in certain of the craft positions. The complexity of the plant and the expertise needed to maintain the plant were such that craft positions of instrument repairman, electrician, machinist and lineman, did, very likely, require fully experienced craftsmen to properly handle the jobs. However, on the hearing on remand, Kaiser has not carried the heavy burden imposed by the reviewing court of *proving* the necessity for these requirements in order to rebut the prima facie proof of discrimination found by the reviewing court. Instead, Kaiser sought to demonstrate that they sometime waived various of the requirements for individual black applicants.[3] Thus, based on the record made herein, I am obliged to conclude that Kaiser has not met their burden of proof in spite of what the court perceives to be a real possibility that they might have done so, at least insofar as several of the craft positions are concerned.

18. Even so, the record indicates that few members of the prospective class have actually shown any individual instance of loss resulting from the procedure followed by Kaiser. The record indicates that a small number of employees who were *helpers* to bricklayers or painters but who did not qualify for craft positions due to a lack of industrial experience *as* bricklayers or painters probably have a valid claim. However, the court was singularly unimpressed with the testimony of some alleged contenders for such craft positions as instrument repairmen, machinists, electricians, and the like, based upon short–term, spotty attendance at various so–called "schools" of electronics, industrial mechanics, etc. This, however, is not the issue that must, under the mandate of the reviewing court and the pretrial order, be here addressed.

## CONCLUSIONS OF LAW WITH RESPECT TO ISSUES (1) AND (2)

█ 1. On remand, defendant has not carried its burden of affirmatively rebut-

---

**3.** The testimony on this was inconclusive and sketchy. Few, if any, *specific* instances were described.

ting the findings by the reviewing court that a prima facie case has been made out. *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir., 1976); *Parson*, supra. Stated differently, Kaiser has failed to meet its burden of showing that its business requirements have such manifest relation to employment and promotion practices as to form a valid basis for otherwise unacceptable practices. *Dothard*, supra.

■ 2. Prospective injunctive relief is unnecessary. Kaiser has embarked on extensive affirmative action programs. Furthermore, Kaiser's extensive revisions with respect to all aspects of the promotion selection process appear to have obviated the discriminatory practices with which we have been here concerned by eliminating essentially all unacceptable subjective emphasis in the foreman selection procedure.

3. Even so, the far-ranging improvements in Kaiser's employment and promotion practices, though relevant to prospective relief, can not obviate the validity of compensatory relief contentions. Kaiser is responsible to those who can show that they have been wronged. Those who have been wronged have a right to be restored to their rightful economic status absent the effects of unlawful discrimination. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir., 1974). *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir., 1974).

4. Parson, accordingly, is entitled to a proceeding to compute the amount of back pay relief to which he is entitled from August, 1967, to some specific point in time to be determined in the remedial proceedings. Though it is the court's present view that 1972 marked the end of the period of unacceptable discriminatory practices at Kaiser, that date determination falls more precisely in the domain of the fact finder who will deal with that specific issue, and I certainly defer to his or her judgment on that issue.

5. Back pay relief for members of the class must be awarded based on individual determinations in the remedial proceeding. As stated in *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437 (5th Cir., 1974):

". . . the initial burden will be on the individual discriminatee to show that he was available for promotion and possessed the general characteristics and qualifications which are shown by Savannah to be possessed by the higher paid white employees and are job related. Once this burden is met, the employer must demonstrate by clear and convincing evidence that any particular employee would have never been advanced because of that individual's particular lack of qualifications for a more difficult position or for other good and sufficient reasons such employee would never have been promoted. It is apparent that whether any particular individual would have been advanced under a color-blind system cannot now be determined with 100% certainty. The court on remand will have to deal with probabilities. Any substantial doubts created by this task must be resolved in favor of the discriminatee who has produced evidence to establish a prima facie case. The discriminatee is the innocent party in these circumstances."

6. Even so, it is obvious at *this* time that not every member of the class is entitled to some award of back pay. Rather, with respect to each potential recipient, an initial showing must be made of economic loss attributable to the unlawful practices in order to raise the question of entitlement to an award of back pay. Though "substantial doubt" is to be resolved in accordance with *Baxter*, few, if any, of the prospective class have, at this stage of the proceedings, carried the burden of showing that they possessed "the general characteristics and qualifications" possessed by those who were promoted. This opportunity must be extended, but that burden is, clearly, upon the claiming party.

7. As a matter of law, since *Parson*, supra, is the law of this case, the defendant has failed to rebut the prima facie conclusion mandated by the reviewing court's judgment.

## CONCLUSIONS OF LAW WITH RESPECT TO ISSUE (3)

1. This court's mandate with regard to discrimination in the crafts is summarized in the following passage:

"The statistical evidence, with the testimony by individual members of the class as to the obstacles they encountered in seeking entry to the crafts, requires the conclusion that the plaintiff made a prima facie showing that the current system, with its prior experience requirement, is discriminatory in effect. Kaiser therefore has the burden of showing that the prior experience requirements has a 'manifest relationship' to the legitimate needs of the crafts positions." *Parson*, at pg. 1390.

2. Arguments based on business necessity to validate prior experience requirements must meet rigorous standards. *Parson*, supra; *Watkins v. Scott Paper Company*, supra. Business necessity, as required therein, is a strict doctrine interpreted by the Court of Appeals in *Watkins* as follows:

"the 'business necessity' doctrine must (do) . . . more than . . . serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. . . . *Necessity connotes an inesistible demand.* To be preserved, (a present employment practice) . . . must not only directly foster safety and efficiency of a plant, but also be essential to those goals. . . . If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued. Id., quoting *United States v. Bethlehem Steel Corp.*, 2 Cir. 1971, 446 F.2d 652, 662 (bracketed material and emphasis added). See also *Rodriguez v. East Texas Motor Freight*, 5 Cir. 1974, 505 F.2d 40, 56 (quoting *Bethlehem Steel*), *appeal pending.*"

3. Kaiser has failed to meet the rigorous burden imposed by the reviewing court with regard to the industrial experience requirements needed to gain employment in the crafts. There has not been an evidentiary showing sufficient to meet the relationship requirements of *Watkins*, supra, although I wonder, as a practical matter, if any company, no matter how well intentioned and well motivated, could fully meet such a standard.

4. As a matter of law, since *Parson*, supra, is the law of this case, the defendant has failed to rebut the prima facie conclusion mandated by the reviewing court's judgment.

5. As stated in the conclusions of law with respect to issues (1) and (2), prospective injunctive relief is unnecessary and the rightful place theory as enunciated in *Pettway v. American Cast Iron Pipe Co.*, supra, and *Johnson v. Goodyear Tire & Rubber Co.*, supra, should be applied in remedial proceedings. Further, the burden of proof in the remedial proceedings should be consistent with *Baxter v. Savannah Sugar Refining Corp.*, supra.

6. Ultimate findings of instances of discrimination in the craft–type job selection process should be limited to those instances where a valid showing of real ability to perform the craft in question is made. As of this time, the record does not support any such *individual* awards except for a very few isolated instances in only two or perhaps three of the craft–type job categories.

## IN GENERAL

As a district judge, I must, of course, follow the law of the case, which, clearly, is *Parson v. Kaiser*, supra.

Though Kaiser's efforts to carry the burden imposed by the mandate on remand were essentially ineffective, disjointed and fell far short of the target, I am obliged to note that Kaiser was confronted–on the basis of the mandate–with an extremely heavy evidentiary burden. I believe it was too heavy under the circumstances. I would hope that a temperate approach might be the order of the day in the application of these findings to the extent that

they are used as a basis for sorting out individual claims for back pay or job advancement.