**Omar OSAHAR, Plaintiff,**

v.

**Paul N. CARLIN, the Postmaster General of the United States Postal Service, Defendant.**

**No. 84–1782–Civ.**

United States District Court, S.D. Florida.

April 30, 1986.

Joel V. Lumer, Miami, Fla., for plaintiff.

R. Andrew German and Cynthia J. Halberlin, Office of Labor Law, U.S. Postal Service, Washington, D.C., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS COURT conducted a non-jury trial in this case at which testimony was adduced, exhibits, including various depositions, were introduced into evidence and closing argument was received. Upon consideration of the aforegoing, and being otherwise fully advised in the premises, this Court hereby recites and enters its Memorandum Opinion containing Findings of Fact and Conclusions of Law as hereinafter set forth.

## Nature of Action

This action was brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16. Plaintiff alleges that Defendant's promotion policies in the maintenance department of the Postal Service's Miami General Mail Facility have resulted in Title VII violations pursuant to both "disparate treatment" and "disparate impact" theories of liability. Plaintiff had originally sought injunctive relief, but this effort was mooted when Defendant ceased using the promotion policies in question. At this juncture, Plaintiff is seeking damages in the form of back pay.

## Jurisdiction

This Court has jurisdiction in this matter pursuant to 42 U.S.C. § 2000e–16.

## Findings of Fact

1. The Plaintiff, Omar Osahar, is a black individual who was first employed by the Postal Service on June 24, 1974 and transferred into the maintenance department on October 18, 1980.

2. The Defendant, Paul N. Carlin, is the Post Master General of the United States and is sued herein solely in his official, representative capacity.

3. This suit concerns Plaintiff's efforts to be promoted to the post of Electronics Technician. An Electronics Technician is responsible for the maintenance, troubleshooting, and testing of electronic circuitry found in mail processing equipment. Plaintiff has sought promotion to the positions of Electronics Technician PS–8 and PS–9. These jobs are quite similar, with the PS–9 Electronics Technician being provided with greater responsibility. Beginning in 1973, the Miami General Mail Facility employed persons in the position of Electronics Technician. The maintenance department did not have a black person as an Electronics Technician until 1982.

4. Since this suit was filed, Plaintiff has been promoted to Electronics Technician (PS–9), and is now seeking back pay as a result of the alleged discriminatory delay in his promotion.

5. On February 17, 1982, the Defendant published Promotion Eligibility Registers (PERs) for the positions of Electronics Technicians, Levels 8 and 9. The Defendant published PERs for the same positions on July 6, 1983. Plaintiff complains herein as to his rankings on these registers.

6. This Court has heard extensive testimony about race relations in the maintenance department of Miami's General Mail Facility. The Plaintiff testified that the racial atmosphere was very strained, and that black employees, including himself, tended to receive the most menial jobs and to be deprived of leadership responsibilities. Plaintiff's testimony was supported by, inter alia, the testimony of black employees James Burney, Richard Jackson, and Robert Jones. Antonio Ortega, a white Electronics Technician, and a friend of Plaintiff's, testified as to racial tensions and racial prejudice in the maintenance department. He related a racial joke told by Plaintiff's current supervisor, Lee Burns, which reflected poorly on black persons. Mr. Burns denied making the joke. A number of other witnesses noted various racial slurs made by supervisors and other employees in the maintenance department. Judy Johnson, the white President of the local postal workers union testified as to numerous racial slurs made by another supervisor, Fred Friedman. Johnson also testified that black employees in the maintenance department received the vast majority of disciplinary action by management. These incidents and events cannot be said to be isolated occurrences. It is apparent, though, that in more recent times the frequency of such occurrences and incidents has subsided markedly.

7. Various supervisors also testified as to the racial atmosphere in the maintenance department. Henry Jablonski, the white acting plant manager testified that race relations were generally good. Lee Burns, a white supervisor, also testified that race relations were generally good, although he did recall various racial jokes and derogato-

ry comments made in the maintenance department which were directed to black persons. Phillip Carroll, a black supervisor, testified that he did not observe overt racial problems in the department, but that he recognized that many others disagreed. He considered race relations to be good, but noted that there were racial cliques in the department and that in working there, he had for the first time encountered "redneck" attitudes.

8. There was, in fact, in the past and until rather recently an atmosphere of tension and ill-feeling between black and white employees in the maintenance department. To be sure, many workplaces reflect some attitudes and behavior which unfortunately continue to exist in our society, but the evidence reveals that these attitudes, and the resulting racial tension had been particularly pronounced in the maintenance department of Miami's General Mail Facility. As previously noted, however, more recently there has been a marked and substantial decrease in the frequency of such incidents, moving well toward better harmony and an end to these events.

9. In this racially charged atmosphere, promotion procedures to the post of Electronics Technician were haphazard, extremely subjective, and never explained (even marginally) to employees. Phillip Carroll testified that to this day he does not understand how promotion procedures worked during the relevant period, despite his repeated inquiries.

10. The Court views the pertinent promotion process as follows:

(a) An employee fills out a Promotion Preference Selection Form (PPFS).

(b) An employee takes the Electronics Technician examination, the MN–500, an objective, validated exam.

(c) An employee who passes the MN–500 exam receives an evaluation from his immediate supervisor pursuant to the Qualifications Rating Form (QRF).

(d) An employee is placed on both the level 8 and level 9 Promotion Eligibility Registers based upon his score on the QRF.

(e) An employee who has reached a high enough position on the registers must take and successfully complete various training courses.

11. It was the impression of many employees, including Mr. Carroll, that an employee's position on the Promotion Eligibility Registers was largely determined by the objective MN–500 examination. In fact, however, the MN–500 was used in Miami as a pass/fail screening device and had nothing to do with one's position on the Promotion Eligibility Registers. Rather, the QRF was the prime measure of an employee's placement on the Registers.

12. The evidence is undisputed that the QRF was never meant to be a promotion ranking device. Indeed, the Defendant concedes that its application of said form violated the Post Office's own procedures. Postal Service Manuals P–11 and P–12B provide instructions as to how the QRF is to be used. Appendix I to P–12B says that the QRF is to be used to "screen out" employees who are not qualified for promotion. The regulations also provide that the questions on the forms were to be made available to employees. In Miami, the very existence of the form, not to mention its vital role in promotion procedures, was not even known to employees. Despite these and other limitations on the use of the QRF, in Miami, the form was filled out by an employee's immediate supervisor without any instruction, explanation, or input from management. There is significant evidence that supervisors would actually ask various employees about their views of their peers. Plaintiff testified, however, that he was never so consulted. Additionally, the model QRF had instructions on its reverse side; in Miami, these instructions were never provided to supervisors.

13. The ratings by supervisors in Miami using the QRF were highly subjective and dependent solely upon the feelings of the supervisors filling out the forms. Any objectivity possessed by the QRF was negat-

ed by Defendant's failure to provide any guidance or explanation to its supervisors. Defendant made little effort to guard against potential discrimination. Moreover, the secrecy surrounding promotion procedures in general, and the very existence of the QRF in particular, is very troubling to this Court.

14. As noted, the Postal Service has developed an examination to test persons seeking promotion to Electronics Technician positions, the MN–500 examination. This exam was the subject of a four (4) year criterion-related validity study that sampled 38% of all the Electronics Technicians employed by the Postal Service. It has been stipulated between the Parties that the MN–500 examination is a valid predictor for performance of the jobs Electronics Technician, Levels 8 and 9. The Defendant's validity study shows that the test produces results that are equal for both black and white employees.

15. Plaintiff scored 85.3 on the MN–500 examination given by Defendant on December 16, 1981. White MPE Mechanics Michael DiGirolamo and Gilbert Millares received scores of 83.5 on this exam. White MPE Mechanic Glenn Atkinson received a score of 81.7.

16. Plaintiff received a ranking of 81.5 on his January 21, 1982 QRF. He was rated by his supervisor Lee Burns, although C.C. Allen, Mr. Burns' black supervisor, signed off on the form.

17. White employees DiGirolamo, Millares and Atkinson all received higher QRF scores than did Plaintiff. Each was placed above Plaintiff on the PERs for Electronics Technicians, Levels 8 and 9 which were issued on February 17, 1982. Each of these white employees, however, received lower scores on the MN–500 examination than Plaintiff did, and were placed above Plaintiff solely because they attained higher QRF scores.

18. Defendant relegated the MN–500 examination to the position of a pass/fail screening device, while at the same time, it used what was meant to be such a screening device, the QRF, as the prime measure for placement on the Promotion Eligibility Registers.

19. Employees DiGirolamo, Millares and Atkinson do not appear on the July 6, 1983 PER for Electronics Technician Level 8, as each had already been promoted to said position. On the July 6, 1983 Register for Electronics Technician 9, each candidate is in the same relative position as he was on February 17, 1982. The only difference between these registers is that the top two (2) persons on the February 17, 1982 register do not appear on the July 6, 1983 register, as they had already been promoted to Electronics Technician Level 9 in the interim.

20. Plaintiff contends that there has been a disparate delay for black employees in promotion to Electronics Technician positions as a result of the overall promotion process used in Miami. Plaintiff has measured the time from when an employee applies for the position to the time when he was actually promoted in order to show this disparate delay. The actual date of promotions is not in dispute. The starting date for measuring the process is.

21. Defendant's Answers to Plaintiff's Interrogatories failed to provide the date on which applicants applied for promotion to Electronics Technician positions, providing only the year. In his deposition, Acting Plant Manager Jablonski stated that the years supplied as application dates were gleaned from the form wherein employees indicated what their "desires" were. This Court finds that this corresponds to the Promotion Preference Selection Form (PPFS). Additionally, from the evidence adduced herein, this Court finds that the PPFS is the best available measure of when an employee sought promotion to an Electronics Technician position.

22. Defendant has provided the PPFS form for all persons promoted to an Electronics Technician position. In some instances the earliest PPSF provided by the Defendant is for a date in a year that comes after the year listed as "date of application" in Defendant's answers to in-

terrogatories. It appears from this discrepancy that the Defendant has not retained in its records all of the PPSF forms of employees promoted to Electronics Technician.

23. The Defendant has in its employee's files a form entitled Potential for Promotion Evaluation Report (PFPER). On each form a supervisor has certified that the particular employee was promotable. In some instances the PFPER in the employee's file predates the PPSF.

24. The Court finds that using the earlier of the dates on the PPSF of PFPER as the starting date in analyzing the time it took for an employee to be promoted is valid for the following reasons: a) it is apparent that the Defendant has failed to retain all of its PPSF forms for its employees; b) all of the persons listed in the Plaintiff's statistical analysis were in fact promoted to an Electronics Technician position, and as hindsight shows, were eligible for the position; c) all persons listed in Plaintiff's statistical analysis were promoted from their jobs as MPE Mechanics directly to the Electronics Technician position—none were promoted to a position other than Electronics Technician after filling out either the PPSF or the PFPER; d) Electronics Technicians Osahar, Burney, and Ortega, as well as former Electronics Technician Carroll all testified that the first step in becoming an Electronics Technician was to fill out the PPSF; and e) as explained below, the alternative measures for a starting date presented by the Defendant are fatally flawed.

25. Using the earlier of the PPSF or the PFPER as the date when a maintenance department employee applied for promotion to Electronics Technician, it appears that the average time to promotion for Electronics Technician Level 8 for white employees is 630 days, while for blacks it is 1212 days. The average time to promotion to the position of Electronics Technician Level 9 is 971 days for whites and 1459 days for blacks. (Where the Defendant was unable to provide either a PPSF or PFPER form, such individual has been excluded from this analysis for reason of lack of information).

26. Of the fifteen (15) employees promoted to the position of Electronics Technician, Level 8 during the relevant period, the black employees ranked as the bottom 3 in time to promotion. Of the 11 employees promoted to the position of Electronics Technician, Level 9, the blacks ranked as numbers 8, 9, and 11. One white employee took the tenth longest time to be promoted.

27. The Mann Whitney U–Test is a generally recognized statistical tool for determining whether differences in outcomes involving small sample populations are statistically significant. *See* Siegel, *Nonparametric Statistics* (McGraw-Hill 1956) at 116–120. Using this statistical tool, it was the testimony of Professor Gary Moran of Florida International University (FIU) that the delay in promotion for black Electronics Technicians as compared to white Electronics Technicians was statistically significant. Professor Moran is a tenured, full-professor in the psychology department at FIU, where he has taught courses in industrial psychology for the past fourteen years. The Court finds Professor Moran's testimony believable.

28. The Court likewise accepts the testimony of Professor Moran and others that the alternative measures suggested by Defendant for measuring time to promotion are severely problematical.

29. The Court rejects the date of an employee's taking the MN–500 examination as the starting date for measuring time to promotion. The Court accepts the testimony of Phillip Carroll that the date of giving the MN–500 was subject to the discretion of management, and was often given only when management needed to fill additional slots on the Registers. Additionally, this Court notes that in Defendant's analysis, using the MN–500 date as the start time, one of Plaintiff's MN–500 test score dates was May 8, 1980, but Defendant did not transfer into the maintenance department until October 18, 1980. Starting dates for times prior to an employee's entry into the maintenance department, would be invalid.

30. The Court also rejects an analysis using the QRF as the start date. The date on which the QRF is filled out is also within the arbitrary discretion of management. In contrast, the date on which the PPSF is filled out is up to the employees. In computing the delay to promotion the Court finds it more reasonable to measure said period by the time between when an employee tells management he wishes to be promoted and when he is in fact promoted.

31. To be sure, there are also some statistical problems in Plaintiff's analysis. Yet, given the apparently haphazard nature of record keeping and promotion procedures in the maintenance department this Court is convinced that Plaintiff's statistical approach was the best available method for measuring disparate impact in the maintenance department. This Court notes that black employee, Phillip Carroll, did not desire to be promoted to Electronics Technician during some of the relevant period and therefore refrained from taking the MN–500 examination for some time. Yet, the Court also notes that Mr. Carroll's delay was caused by his frustration with Defendant's subjective and secretive promotion system, and in view of the problems with alternative measures, this Court finds it appropriate not to exclude Mr. Carroll from the statistical sample.

■ 32. This Court therefore finds, based on the testimony of Professor Moran, that the promotion procedures in the maintenance department had a disparate impact on black persons by delaying their time to promotion to Electronics Technician positions.

33. This Court finds that if Plaintiff had been promoted to Electronics Technician when the first white employee with a lower MN–500 score was promoted, then the back pay lost by Plaintiff through March 6, 1986 would be $2750.00

### Conclusions of Law

1. Title VII of the Civil Rights Act is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate the inconvenience, unfairness, and humiliation of racial discrimination. *Quijano v. University Federal Credit Union*, 617 F.2d 129, 131 (5th Cir.1980).

2. Plaintiff advances two theories of liability, "disparate treatment" and "disparate impact." These approaches shall be considered individually by the Court.

3. The elements of a disparate treatment claim have been established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Supreme Court has noted that in a discriminatory treatment case, the "plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination.... if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection.... should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, *supra*, 450 U.S. at 253, 101 S.Ct. at 1093.

4. "The burden of establishing a *prima facie* case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of discrimination." *Id.* The Supreme Court has established a "not inflexible" model for a *prima facie* case of discrimination. The Plaintiff must show: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id.*

5. The Plaintiff is black. He scored higher than three white co-workers on the MN–500 examination. Said examination was the only objective measure of an employee's job ability in the promotion process. The three white co-workers were promoted before Plaintiff at a time when Plaintiff was otherwise as qualified as the white co-workers for the Electronics Technician position. Thus, a *prima facie* case of discrimination has been made out by Plaintiff.

6. "Disparate treatment is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color.... Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36, 97 S.Ct. 1843, 1854–55, 52 L.Ed.2d 396 (1977).

7. The treatment of Mr. Osahar as compared to the three similarly situated white employees gives rise to an inference of discrimination. The Court notes that the *McDonnell Douglas* framework "is only a tool. The ultimate question in a disparate treatment case is not whether a Plaintiff has established a *prima facie* case or demonstrated pretext, but whether Defendant intentionally discriminated against Plaintiff." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir.1984).

8. The *McDonnell Douglas* analysis is "intended to progressively sharpen the elusive factual question of intentional discrimination." *Burdine, supra*, 450 U.S. at 254, n. 8, 101 S.Ct. at 1094, n. 8.

9. In a disparate treatment case the Defendant must introduce some admissible evidence showing a legitimate non-discriminatory reason for its action, but it need not prove that it was actually motivated by the proffered reason. It is sufficient if the Defendant's evidence raises a genuine issue of fact as to whether it discriminated against Plaintiff. *Id.* at 254, 101 S.Ct. at 1094.

10. This Court finds that Defendant's proffered explanation that Plaintiff's treatment derived from his QRF score satisfies Defendant's burden of production on this issue. So too, this Court finds Defendant's argument that Article 33 of its Collective Bargaining Agreement with the Postal Workers, limiting the degree to which written examinations can be used in promotion evaluations, is also a legitimate non-discriminatory reason for Defendant's actions.

11. This finding, however, does not end the inquiry. Indeed, "Because of the employee's easy burden of establishing a *prima facie* case and the employer's normal ability to articulate some legitimate non-discriminatory reason for its actions, most disparate treatment cases turn on Plaintiff's ability to demonstrate that the non-discriminatory reason offered by the employer was a pretext for discrimination." *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir.1985).

12. The Plaintiff herein has met his evidentiary burden of proving pretext and has thereby made out a case of intentional discrimination.

13. First, this Court has considered the atmosphere of racial tension and animosity existing in the maintenance department as relevant background information as to whether Title VII liability exists. *Cf. Walker v. Ford Motor Company*, 684 F.2d 1355, 1358–59 (11th Cir.1982).

14. The Plaintiff's statistical evidence as to promotion time for black employees as compared to white employees is also of evidentiary value in making out Plaintiff's disparate treatment case. "It is clear law in this Circuit ... that statistics as to racial composition of Defendant's workforce must be considered in judging intentional allegations of discrimination." *Parson v. Kaiser Aluminum and Chemical Corp.*, 575 F.2d 1374 (5th Cir.1978). *See also Miles v. M.N.C. Corp., supra*, 750 F.2d at 873 (statistical evidence provided a background against which to assess individual claims). This statistical evidence as well as the evidence of racial tension and animosity

is, however, by no means crucial to this Court's ultimate conclusion as to the "disparate treatment" claim.

15. This Court's finding of pretext is based primarily upon the secretive and subjective nature of Defendant's promotion policies in conjunction with the clear inference of discrimination created by Defendant's promoting three white employees with lower MN–500 scores than Plaintiff, ahead of Plaintiff. Defendant rejected a validated, objective exam as a means of measuring promotability in favor of a subjective evaluation by immediate supervisors, who were largely white.

■ 16. Defendant's argument that Article 33 of the pertinent labor agreement forced it to rely on the QRF to the exclusion of the MN–500 is clearly a pretext. The Union President, Judy Johnson, testified that the Union had no such understanding of Article 33. Said provision prohibits the use of written examinations as a controlling factor in promotion decisions. Because various training courses were required before promotion even after passing the MN–500 exam, it cannot even be said that reliance on the MN–500 to the exclusion of the QRF would violate Article 33. In any event, Defendant's argument misperceives the nature of Plaintiff's legal challenge. Plaintiff is challenging Defendant's overall promotion process. To say that promotability cannot be based solely on the MN–500 exam is not to say that the MN–500 cannot play an important role in promotion evaluation. And, surely, Article 33 of the labor agreement cannot justify Defendant's use of subjective evaluation criteria, to the near exclusion of objective evaluation.

17. This Circuit has repeatedly condemned subjective promotion systems administered largely by white supervisors in racially charged atmospheres. *See, e.g., Miles v. M.N.C. Corp., supra,* 750 F.2d at 871 (noting that subjective evaluations by white supervisors "provide a ready mechanism for racial discrimination.") The secrecy which pervaded this particular promotion system subjects Defendant's system to particular scrutiny.

18. In an analagous context in *Rowe v. General Motors Corp.,* 457 F.2d 348, 358–359 (5th Cir.1972), and again in *Parson v. Kaiser Aluminum and Chemical Corp., supra,* 575 F.2d at 1385, this Circuit noted that the following aspects of a promotion procedure provided a ready mechanism for discrimination: a) The foreman's recommendation is the indispensable single most important factor in the promotion process; b) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. They are given nothing in writing telling them what they are looking for in making their recommendations; c) Those standards which were determined to be controlling are vague and subjective; d) Hourly employees are not notified of promotion opportunities nor are they notified of qualifications necessary to get their jobs; e) There are no safeguards in the procedure designed to avert discriminatory practices. These factors are, to a considerable extent, present in Defendant's promotion system. Although the QRF did contain what might be at first glance be deemed objective criteria, Defendant's failure to provide any guidance to its supervisors, its clear violation of its own procedures, designed in part to assure fairness, as well as the secrecy of the process, in conjunction with the totality of all the evidence, serve to meet Plaintiff's burden of persuasion that the QRF served merely as a pretext for impermissible, intentional discrimination. *See also Robbins v. White-Wilson Medical Clinic, Inc.,* 660 F.2d 1064, 1067 (5th Cir. Unit B 1981).

19. This Court finds instructive *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495 (11th Cir.1985) wherein the Court, although affirming a District Court's finding of no discrimination, noted that subjective methods of evaluation were very relevant as to pretext determinations and that "the fact that an employer never formally announces a decision-making criterion and interprets it according to its own lights is relevant to an employee's claim of discrimination. The use of unannounced policies, interpreted

according to subjective criteria will tend to support a Plaintiff's claim of pretext." *Id.* at 1500. *See also Morrison v. Booth,* 763 F.2d 1366, 1374 (11th Cir.1985) (Departures from normal procedures may be suggestive of discrimination).

20. For further disapproval of subjective promotion procedures in this Circuit, *see Fisher v. Procter & Gamble,* 613 F.2d 527, 544 (5th Cir.1980); *Maddox v. Claytor,* 764 F.2d 1539, 1546 (11th Cir.1985); *Davis v. Metropolitan Dade County,* 480 F.Supp. 679, 682 (S.D.Fla.1979); *Crawford v. Western Electric,* 614 F.2d 1300 (5th Cir.1980).

21. For the above reasons, this Court finds that Plaintiff's treatment as to compared to three equally qualified white employees, considered in the totality of all the evidence, including the secretive and subjective promotion practices of Defendant, constitutes intentional discrimination such that Plaintiff is entitled to relief pursuant to the "disparate treatment" theory.

22. As noted, Defendant's promotion procedures had a statistically significant disparate impact on black employees.

23. "Disparate impact occurs when an employer bases an employment selection decision on a criterion that is neutral on its face but disfavors black employees in operation.... Once the employee has shown that the facially neutral employment practice has a discriminatory impact, the employer may nevertheless prevail by showing that the practice was a 'business necessity.' A practice is a business necessity only if it bears a manifest relationship to the employment in question.... The burden of persuasion shifts to the employer to prove business necessity and rebut the plaintiff's *prima facie* case.... Under the disparate impact model, if the employer establishes job-relatedness, the burden then shifts to the employee to show the availability of other selection devices with a lesser adverse impact which would serve the employer's needs ... or to show that the employer was using the practice as a pretext for discrimination." *Walker v. Jefferson County Home,* 726 F.2d 1554 (11th Cir.1984) (citations ommitted). *See gener-*

*ally Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

24. Defendant has made no showing that its overall promotion procedures were a business necessity. Article 33 of the pertinent labor agreement did not require Defendant to rely on a subjective and poorly administered promotion process. *See also Jackson v. Seaboard Coast Line Railroad Company,* 678 F.2d 992, 1017 (11th Cir.1982) (even if a promotion procedure is part of a labor agreement, said procedure cannot be justified as a business necessity). Likewise, and more generally, there has been no other showing of business necessity made by Defendant.

25. It is clear that any number of alternative procedures, including the MN–500 examination, could have served Defendant's needs without the adverse impact of the promotion system in question. Additionally, of course, a less subjective evaluation system would likewise serve Defendant's needs. Further, Plaintiff has demonstrated that the promotion system in question was, in fact, a pretext for discrimination.

26. Thus, in view of the discriminatory impact of Defendant's promotion procedures herein, Plaintiff is entitled to relief under the "disparate impact" theory.

27. This Court is empowered to award back pay and order such affirmative action as may be appropriate. 42 U.S.C. § 2000e–5(g). Within that authority, the Court awards the Plaintiff $2750.00 in back pay and instructs the Defendant to give the Plaintiff time-in-grade seniority in the position of electronics technician level 9 as of February 17, 1984, the day immediately preceding the day on which the first white co-worker with a lower score on the MN–500 test than Plaintiff was promoted to that position.

28. Costs are hereby assessed against Defendant in favor of Plaintiff, and a Bill of Costs shall be submitted to the Clerk of the Court within ten (10) days herefrom.

29. Pursuant to and in accordance with 42 U.S.C. § 1988, and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), Plaintiff may file, within ten (10) days herefrom, a Motion for Attorney's Fees, along with supporting documentation, including the affidavits of two disinterested attornies. Defendant may respond within ten (10) days thereafter or the Parties may endeavor to stipulate to the appropriate amount of attorney's fees, subject to their right of appeal and the approval of this Court. If this procedure is inadequate, the Court will hold an evidentiary hearing thereon upon request.